**SHELL OIL COMPANY, a Corporation, Plaintiff in Error,**

v.

**DAVIDOR & DAVIDOR, Corporation Commission of the State of Oklahoma, and the State of Oklahoma, Defendants in Error.**

No. 37323.

Supreme Court of Oklahoma.

June 25, 1957.

As Amended Sept. 9, 1957.

Rehearing Denied Sept. 10, 1957.

Jesse M. Davis and Gordon Watts, Tulsa, for plaintiff in error.

T. Murray Robinson, Leon Shipp, Oklahoma City, for Davidor & Davidor.

Floyd Green, Oklahoma City, for Corporation Commission of Oklahoma.

BLACKBIRD, Justice.

In an area of Woods County known as the Teagarden Field, Davidor & Davidor, oil and gas lessees of a part thereof, drilled a well discovering natural gas and gas dis-

tillate production in a formation called the Mississippi Lime, or Limestone, encountered in said well at a depth of 5,750 feet. Thereafter, they applied to this State's Corporation Commission, hereinafter referred to merely as the "Commission", to order well-spacing units of 320 acres each in nine sections of land around the well. Stanolind Oil and Gas Company and Shell Oil Company were among the area's lessees opposing the application and contending for larger well-spacing units of 640 acres each. When, after hearings on the matter, the Commission entered its order granting Davidor & Davidor's application and fixing the size of the units at 320 acres each, both Stanolind and Shell gave notice of appeal to this Court. Thereafter, Stanolind withdrew its notice and Shell, hereinafter referred to as appellant, perfected the present appeal, in which Davidor & Davidor and the Commission are, and will hereinafter be referred to, as the appellees.

Appellant's position herein is that the order is contrary to the undisputed evidence, which it represents as undisputedly showing that 320-acre units will cause economic waste and will not protect the correlative rights of owners of minerals and mineral rights in the common source of supply underlying the nine-section area. Its argument is based on the premise that wells drilled on as small a unit as 320 acres will not yield sufficient returns on the lessees' investments in the drilling and operation of such wells to make them, from a financial standpoint, a worthwhile undertaking. In its Report, the Commission made, among others, the following findings:

"5. That one well will effectively drain not less than 320 acres of such Mississippi lime formation of its recoverable gas and incident liquids, and that the economics of recovery are such that wells can be drilled to a density of one well to each 320 acres with sufficient profit to the lessees to cause the full development of the reservoir and the draining of all productive drilling and spacing units.

"6. That the reservoir has a thickness of not less than 6 feet and not more than 20 feet, and that *at 6 feet a profit per unit of $68,532.00 will be realized,* and that *at 20 feet* a substantially greater profit will be realized.

"7. That the owners of a substantial portion of the leasehold rights within the area desire to develop with one well to each 320 acres, and the owners of a substantial portion of the leasehold rights within the area desire to develop with a well density of one well to 640 acres, and the Commission cannot accede to the request of both such owners, and *has determined,* without regard to the ownership of the oil and gas leasehold rights, *that one well to 320 acres is the proper well density for the development of this Mississippi lime reservoir, whether the thickness thereof be 6 feet or 20 feet; * * *"* (Emphasis ours).

▆▆▆▆ Appellant advances no criticism of the Commission's above-quoted finding to the effect that a well with production from six feet of the Mississippi Lime will earn a net profit of $68,532, but it steadfastly maintains that this amount of profit on a well, which, at the lowest figure shown in the testimony costs $70,000 to drill, is lower than any ratio of profit to investment that all of the witnesses testified was essential to development of the field. According to Davidor & Davidor's witness, R. A. Armstrong, such ratio should be a minimum of 2½ to 3–1, i. e., $2.50 or $3.00, in profits, for each dollar invested. Other witnesses gave similar opinions. Armstrong further testified that, on the basis of his calculations, he had concluded that there is an average of 5,680,000,000 feet of gas in place under each 320-acre unit, and, of this amount, 486,000,000 feet would be recoverable as the lessee's ⅞ths share, which, at a price of 10¢ per thousand, would amount to a gross revenue of $486,000. Whether this figure includes any amount for the distillate that such a well will produce (which Armstrong estimated at 22,000 barrels) while produc-

ing natural gas, does not clearly appear, but, when it is compared with the $70,000 of drilling cost, plus $10,000 as the cost of constructing a compressor station and an additional $5,000, which Armstrong described as "lease expense", making a total of $85,000 per well, a ratio *above* 4–1 is the result. According to Armstrong's testimony, the $85,000 does not include operating expenses after installation of the compressor, which cost, according to the testimony, could be as low as $75 per month, or as high as $200 per month. The total of this latter cost would depend upon how long the well was produced after it quit flowing and the compressor was installed. Also Armstrong's figures on gross recovery per well was computed on the basis of a 20-foot interval of producing formation per well, which was his opinion as to said formation's thickness in the discovery well. On cross examination, he admitted that, in this well, only 9 feet of said formation had actually been penetrated; but there is a substantial difference between this thickness and the "6 feet of pay" which appellant's counsel use as a basis for demonstrating that a well producing from the formation involved herein will yield no more net profit than .20 over its cost. A conclusion, that the producing formation in the field has an average thickness of enough more than six feet to allow wells producing therefrom to yield a profit of at least the approved 2.5–1 ratio, cannot be said to be without substantial evidentiary support. It follows that the Commission's finding that a well can be drilled on every 320 acres overlying the common source of supply, or reservoir, "with sufficient profit to the lessees to cause the full development of the reservoir, and the drilling of all productive drilling and spacing units" also is sufficiently supported by the record. Since the evidence is adequate to support this finding, we consider it immaterial that the Commission included in its report the further finding that 320-acre spacing prescribed "the

proper well density for the development of this Mississippi lime reservoir, *whether the thickness thereof be 6 feet or 20 feet;* * * *"* which said finding furnishes appellant its most credible basis for arguing the insufficiency of the evidence to support the order. The Commission's other findings, without consideration of this latter one, are sufficient to support the order. Consequently said finding's correctness is inconsequential, and unnecessary to determine, under the principle of appellate review applicable to orders of the Corporation Commission, as well as to court orders and judgments. See Choctaw Gas Co. v. Corporation Comm., Okl., 295 P.2d 800.

Nor can we uphold appellant's confident assertion that, on the basis of the testimony, 320-acre spacing, will not protect the correlative rights of owners of interests in the common source of supply, because of the gas they predict will be left in the reservoir on account of prudent operators' refusal to invest the sums necessary in drilling for, and producing, it with such a small anticipated margin of profit. We have carefully examined all of the testimony and have been unable to find therein any unequivocal statement that no prudent operator would undertake the drilling of a well on a 320-acre unit. Contrary to the inference in appellant's brief, the testimony of the witnesses who supported 640-acre spacing, in contrast to 320-acre spacing, can be strictly construed as merely stating that these witnesses would not *recommend* drilling on 320-acre units.

Nor does our examination of the record support appellant's argument to the effect that the Commission's order will result in economic waste through the drilling of unnecessary wells. While it is true that generally the witnesses, who testified in support of 640-acre spacing, also testified that one well would drain that large an area, Mr. Armstrong's testimony was to the effect

that because of the variations in the permeability and porosity of the producing formation in that area, one well could not reasonably be expected to drain that large an area, and that the only way to assure maximum ultimate recovery would be to have one well to each 320 acres.

On the basis of the record, it is our opinion that there is substantial evidence to support the order appealed from, and that appellant's arguments establish no ground for its reversal. Accordingly, under the rule governing the review of such orders (see Application of Champlin Refining Co., Okl., 296 P.2d 176, 179, and the cases there cited) said order must be, and is, hereby affirmed.

CORN, V. C. J., and DAVISON, JOHNSON, WILLIAMS and JACKSON, JJ., concur.

HALLEY and CARLILE, JJ., dissent.