STATE of Oklahoma ex rel. Attorney General Jan Eric CARTWRIGHT, Appellant,

v.

OKLAHOMA NATURAL GAS COMPANY and the Oklahoma Corporation Commission, Appellees.

No. 56438.

Supreme Court of Oklahoma.

Jan. 19, 1982.

Rehearing Denied Feb. 23, 1982.

1342

Jan Eric Cartwright, Atty. Gen., Michael L. Bardrick, Asst. Atty. Gen., Chief, Consumer/Utility Div., Oklahoma City, for appellant.

John L. Arrington, Jr., John A. Gaberino, Jr., Thomas J. Kirby, Huffman Arrington Kihle Gaberino & Dunn, Tulsa, for appellee, Oklahoma Natural Gas Co.

LAVENDER, Justice:

Appellee Oklahoma Natural Gas Company (Oklahoma Natural) is a natural gas public utility whose rates are subject to the

jurisdiction of the Corporation Commission of Oklahoma (Commission). Oklahoma Natural has been engaged in the purchase, transmission, storage, and distribution of natural gas since October 1906, and it currently serves an estimated combined population of approximately 2,000,000 in Oklahoma through its facilities in 209 cities and towns and adjoining rural areas, and either the full or partial requirements of 51 communities through its transmission lines.

Oklahoma Natural filed an application before the Commission, seeking authority to increase its natural gas rates to its utility customers. The proceedings were referred to a referee of the Commission for hearing. Several industrial customers of Oklahoma Natural intervened in the cause on the issue of the spread of any rate increase between and among Oklahoma Natural's customers. Upon hearing, the referee filed with the Commission his report recommending an increase in Oklahoma Natural's rates in the amount of $29,451,199. Thereafter, the Commission entered its order granting Oklahoma Natural a rate increase of $26,-609,172 and determining the proportionate spread of the increase between and among Oklahoma Natural's customer users.

From this order, the Attorney General of the State of Oklahoma (Attorney General) appeals.

The Attorney General filed no exceptions to the Report of the Referee in the proceedings before the Commission and did not seek a review by the Commission or apply for a rehearing or new trial before the Commission with reference to the points and issues he now raises on appeal for judicial review by this court. Oklahoma Natural urges that, as a result, the Attorney General has either waived the right to raise them now on appeal to this court, or that said points and issues have not been properly preserved for judicial review by this court.

The power and the authority of the Commission to supervise, regulate, and control Oklahoma Natural's rates for the sale of its gas are found in Art. IX, § 18 of the Oklahoma Constitution,[1] 17 O.S.1971, § 151, et seq.,[2] 17 O.S.1971, § 162,[3] and in the Corpo-

---

1. Const., Art. IX, § 18 insofar as pertinent provides:

 "The Commission shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classifications, rules and regulations adopted, or acted upon, by any such company, inconsistent with those prescribed by the Commission, within the scope of its authority, shall be unlawful and void. * *."

2. The pertinent provisions of 17 O.S.1971, § 151, et seq. are as follows:

 Sec. 151: "The term 'Public Utility' ... shall be taken to mean and include every corporation ... that now or hereafter may own, operate, or manage any plant or equipment, or any part thereof, directly or indirectly, for public use, or may supply any commodity to be furnished to the public.
 
 "(a) For the conveyance of gas by pipe line.
 "(b) For the production, transmission, delivery or furnishing of heat or light with gas."

 \* \* \* \* · \* \*

 Sec. 152: "The Commission shall have general supervision over all public utilities, with power to fix and establish rates and to prescribe rules, requirements and regulations, affecting their services, operation, and the management and conduct of their business; shall inquire into the management of the business thereof, and the method in which same is conducted . . . . ."

 Sec. 155: "The Commission may, from time to time, adopt or promulgate, such orders, rules, regulations or requirements, relative to investigations, inspections, tests, audits, and valuations of the plants and properties relative to inspection and tests of meters as in its judgment may be necessary and proper; provided, that under the provisions of this act, any public utility, corporation, ... may appeal from any order or finding or judgment of the Corporation Commission as provided by law in cases tried and heard before said Commission of transportation and transmission companies."

3. 17 O.S.1971, § 162: "The Corporation Commission is authorized and empowered to assign

ration Commission's General Rules and Regulations Governing the Operations of Gas Utilities in the State of Oklahoma.[4]

■ Did the Attorney General's failure to file "exceptions" under OCCRP 19(c) and 24 constitute a waiver of the objections to the Commission's rate order? We hold not. A cursory reading of OCCRP 19(c) discloses that the rulings therein referred to relate to matters of procedure and not to the substantive findings and recommendations of the hearing officer. The rule authorizes and directs that the hearing officer "shall rule upon admission of evidence, and objections thereto, and shall rule upon any other motion or objection arising in the course of the hearings," and unless said objections to rulings on evidence or other procedural matters are preserved by exceptions pursuant to Rule 24, they are waived. No issue pertaining to the admission of evidence or rulings by the referee within the meaning of Rule 24 is raised by the Attorney General.

Did the Attorney General's failure to file written exceptions with the Commission to the report of the referee pursuant to Rule 24; or his failure to file with the Commission a motion for rehearing; or an application to set aside, amend or modify the order; or for any other form of relief from the order pursuant to Rule 24 constitute a waiver of the right to raise the issues urged by the Attorney General, or did such failure result in said issues not being properly preserved for review by this court?

■ We are mindful that Rule 24 and Rule 26 in authorizing the filing of exceptions to the report of the referee and in authorizing a motion for rehearing, or an application to set aside, amend or modify the Commission's order use the word "may," rather than the word "shall," which under general rules of construction make such procedures permissive and not mandatory.[5] We are further aware that the report and recommendations of the hearing

---

persons in its regular employ as examiners, who shall be designated as Referee, and who shall have power to administer oaths, examine witnesses, and receive evidence and report the same to the Corporation Commission, under such rules and regulations as the Commission may adopt; ...."

4. The pertinent regulations of the Corporation Commission are as follows:

Rule 1. "(a) These rules shall be known as the Oklahoma Corporation Commission Rules of Practice, and may be cited as OCCRP.

\* \* \* \* \* \*

"(c) These rules shall govern all proceedings before the Oklahoma Corporation Commission, and commissioner, deputy, panel, trial examiner, referee, attorney or other officer or employee of the Commission.

Rule 19: \* \* \*

"(c) The ... hearing officer shall exercise all of the powers of the Commission in the conduct of a proceeding. The ... hearing officer shall rule upon admission of evidence, and objections thereto, and shall rule upon any other motion or objection arising in the course of the hearing. *Review of a ruling of a hearing officer, other than a deputy, shall be by exceptions pursuant to Rule 25 [sic should read Rule 24], and any objection to a ruling or other action of such hearing officer not included in such exceptions and amendments thereto, shall be deemed to have been waived.* (Emphasis added.)

Rule 23: "(a) At the conclusion of a hearing before a hearing officer, other than a deputy, such officer shall, at the earliest practicable date, file his written report in the proceeding.....

"(c) At the expiration of five days after the report is filed, *if no exceptions thereto are filed*, the Commission shall enter such order as shall be deemed appropriate upon consideration of the report. (Emphasis added.)

Rule 24. "(a) Within five days after the report of a hearing officer, other than a deputy, is filed, any party adversely affected by the report *may* file his written exceptions thereto, and serve a copy thereof by regular mail upon each party of record. (Emphasis added.)

Rule 26: "(a) Within ten days after an order of the Commission is entered, any party *may* file a motion for a rehearing; or an application to set aside, amend or modify the order; or for any other form of relief from the order. The motion or application shall specifically state:

\* \* \* \* \* \*

Such application shall be set for hearing before the Commission, unless referred. A copy of the application, including notice of the date set for hearing, shall be served by the applicant upon each party of record by regular mail." (Emphasis added.)

5. *Shea v. Shea*, Okl., 537 P.2d 417 (1975).

officer are advisory only [6] and are not binding upon the Commission, and that the Commission is required to reach its own conclusions upon the evidence and make adequate findings, and may accept or reject any or all of the recommendations of the examining officer, or add to them.[7]

We are further cognizant of the fact that this court has on many occasions ruled that a motion or a new trial or a motion for rehearing is not a necessary prerequisite to an appeal from an order or determination of the Commission.[8]

However, this court has not heretofore addressed the precise question presented here. Matters pending before the Oklahoma Corporation Commission are generally of a complex and technical nature which should be considered and initially decided by that body whose personnel are best equipped to amalgamate those intricacies into specific findings and conclusions in a form presentable for review on appeal. To permit a review on appeal of findings and determinations which were not properly and fully presented to the Commission for its deliberation and informed determination is to deprive the public at large and the appellate court of a valuable and necessary service.

At the very heart of our adversary judicial system is informed opposition. Orderly procedure and good administration require that objections available in proceedings before an administrative agency be made while it has an opportunity for reconsideration and correction at the time appropriate under its practice. To permit an adversary to sit quietly by until an administrative proceeding is closed and lodged in an appeal, and then raise issues on appeal, which

if timely objected to in the manner authorized by the rules governing the agency's proceedings might have been cured, is subversive of both the purposes for which the Commission was created and of the adversary system which gives those purposes fulfillment.[9]

■ We therefore hold that matters which could have been presented before the Commission under rules governing proceedings before that body and which were not presented before the Commission either by affirmative evidence, objection or proceedings for review by the Commission are precluded from review by this court on appeal by a party who is adversary thereto.

■ However, since this ruling is a departure from what has become an accepted practice in cases on appeal from the orders of the Commission and its application to the case at bar would therefore inflict upon the Attorney General some of the very harms which we seek to here avoid, it is the decision of this court that application thereof be prospective only, and the same shall be applied only in those cases hereinafter filed or in those cases now pending where there is a timely opportunity therein to apply the same.

■ In the absence of an assertion of a violation of right under the state or federal Constitution, the permissible scope of review by this court of orders of the Commission is limited to a determination of whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.[10] And,

6. *Cameron v. Corporation Commission*, Okl., 414 P.2d 266 (1966).

7. 2 Am.Jur.2d, Administrative Law, § 438.

8. *Garrison v. State*, Okl., 420 P.2d 474 (1966); *Crews v. Shell Oil Company*, Okl., 406 P.2d 482 (1965); *Republic Natural Gas Co. v. State*, 198 Okl. 350, 180 P.2d 1009; *Holzbierlein v. State*, 197 Okl. 509, 172 P.2d 1007 (1946).

9. 2 Am.Jur.2d, Administrative Law, §§ 724, 725.

10. Oklahoma Constitution, Art. IX, § 20; *Southern Union Gas Co. v. Texas Cty., etc.*, Okl., 564 P.2d 1004 (1977); *Tecumseh Gas System v. State*, Okl., 565 P.2d 356 (1977); *Application of Arkansas Louisiana Gas Company*, Okl., 558 P.2d 376 (1976); *Union Texas Pet., et al. v. Corporation Comm'n, et al.*, Okl. (1981).

as we said in *Central Oklahoma Freight Lines, Inc. v. Corporation Commission* : [11]

"The term 'substantial evidence' means something more than a scintilla of evidence and means evidence that possesses something of substance and of relevant consequence such as carries with it fitness to induce conviction, and is such evidence that reasonable men may fairly differ as to whether it establishes a case."

■ In the recent case of *El Paso Natural Gas Company v. Corporation Commission of The State of Oklahoma, et al.,* [12] this court enunciated the rule that determining whether there is substantial evidence in support of the Commission's findings and conclusions, requires a review by this court of the whole of the evidence found in the record including such evidence which fairly detracts from the weight thereof.

Measured by the foregoing guidelines, we will consider the objections to the order of the Commission raised by the Attorney General.

In furtherance of its application for a rate increase, Oklahoma Natural used as the test year the year ending August 31, 1980, without objection on the part of any of the parties.

1. *Publication and distribution of "Flame Tips" as an Expense.*

■ Included in the monthly billing envelope addressed to its customers during the test year was a publication prepared by Oklahoma Natural entitled "Flame Tips," at an annual cost of $85,922, or 16 cents per customer. The Attorney General objects to the inclusion of this cost as an allowed expense to Oklahoma Natural on the assertion that it is not a cost of providing gas service to customers. However, P. A. Wimpey, Senior Vice President-Financial of Oklahoma Natural, testified that the publication was the primary vehicle through which Oklahoma Natural communicated

with its customers on matters required by the Commission and the Department of Transportation Regulations, and by utilizing the billing envelope for mailing was distributed at a smaller cost per year than would have been the cost of a single mailing of a required notice without the use of the billing envelope. He further testified that the publication contained items relating to energy conservation as well as cooking recipes. His evidence was undisputed, and we hold that there was substantial evidence in support of the Commission's allowance the cost of the "Flame Tips" publication as an expense item of Oklahoma Natural.

2. *Oklahoma Natural's Blanket Job Orders as an Expense.*

■ The Attorney General challenges the sum claimed as an item of utility investment by Oklahoma Natural in the amount of $1,850,000 on the ground that such jobs were not let with cost savings in mind. Mr. Wimpey testified that the blanket job orders consisted of costs incurred by Oklahoma Natural for minor construction projects, usually involving line extensions to customers and jobs usually performed by Oklahoma Natural itself. All major construction projects are let upon competitive bid. He further testified that the utility did procure minor construction projects with cost savings in mind. His testimony was not disputed and there was no evidence offered to show any minor construction job was not let with cost savings in mind. There was substantial evidence in support of the Commission's finding and determination.

3. *School Appliance Program.*

■ Oklahoma Natural Gas claimed an amount of $38,000 during the test year as an operating expense for furnishing home economics school classes with gas ranges.

Mr. Wimpey testified that the purpose of the program was to inform and educate

11. Okl., 484 P.2d 877 (1971); quoted with approval, *Tecumseh Gas System v. State, supra,* n.10.

12. Okl., 640 P.2d 1336 (1981).

students on conservation of energy through the use of efficient modern natural gas appliances. This evidence was not disputed and we hold it sufficiently substantial to support the finding and determination of the Commission.

4. *Money Spent for Funding of Gas Research Institute.*

 The Commission allowed the sum of $433,309, the amount actually spent by Oklahoma Natural during the test year, in the funding of the Gas Research Institute as an item of expense. The testimony of J. D. Scott, Executive Vice President of Oklahoma Natural, supported by its exhibit, discloses that GRI is an independent, not-for-profit scientific organization created to plan and implement research and development activities for the benefit of the natural gas consumer. GRI itself does not engage directly in research and development, but is a planning and managing organization which pursues such activities through project contracts with not-for-profit institutes, technical consulting firms, universities, energy companies, and equipment manufacturers engaged in gas-related research and development. Currently, GRI is engaged in research and development projects involving gas-fired heat pumps, improved gas furnaces, improved gas water heaters, and improved gas domestic appliances which will provide direct benefits to the residential consumer. On the industrial aspects of its activities, GRI is engaged in research to develop an industrial heat pump, improved burner systems, and other conservation related projects. It is engaged in research to improve safety in the distribution of gas to the consumer and in developing alternative sources of gaseous fuels and enhanced recovery techniques for existing natural gas supplies which will benefit ratepayers. This evidence was unrefuted and was sufficiently substantial to support the Commission's finding and determination that the cost of GRI funding was a proper item of the utility's expense.

5. *Area Development Expense.*

 The Commission approved an expense item of $3,700,000 for "Area Develop-

ment" expended by Oklahoma Natural during the test year. The Attorney General argues that this item should not have been allowed because "The attraction of new industry is not a proper function of a regulated gas utility nor is it a proper cost of gas service to ratepayers." Mr. Wimpey testified that the item encompasses the total expenses incurred by Oklahoma Natural's entire marketing department which has many more functions than just the attraction of new industry to Oklahoma.

Both Wimpey and Scott testified that the utility provided assistance to the state and local chambers of commerce in attracting new industry to Oklahoma, and that attraction of new industry to the state would be beneficial to Oklahoma Natural's ratepayers. For example, the adding of new industry would build Oklahoma Natural's load, thus spreading its fixed costs over a broader base of customers and limiting the need for future rate relief. The testimony was undisputed and constitutes substantial evidence in support of the Commission's findings and determination with reference to the utility's Area Development Expense.

6. *Including as "Operating Expense" Such Things as Service Award Banquets, Livestock Purchased at State Fairs, Floral Expenses, and Rental Space at State Fairs.*

Mr. Wimpey characterized these expenditures as a necessary part of doing business and that Oklahoma Natural, as any other business, was required to support the civic activities of the communities in which it operates.

 Particularly in view of the relatively modest amounts spent on these items, we hold there was sufficient substantial evidence (which was undisputed) to support the findings of the Commission.

The Attorney General next urges that the Commission, in arriving at Oklahoma Natural's total adjusted operating revenues for the test year, "assumed" total operating revenues of the utility for the test year were $601,198,242, without said figure be-

ing supported by evidentiary facts. Suffice it to say that the figure appeared as a part of Exhibit 22 which was sponsored by Oklahoma Natural's witness, Wimpey, and submitted to the Commission. The Commission staff reviewed and audited Oklahoma Natural's financial records including the $601,198,242 figure, the results of which review and audit were submitted to the Commission without objection. The Attorney General challenges the figure used by all of the parties before the Commission for the first time on appeal to this court. In the case of *Mann v. Welch*,[13] we held (Syllabus 2 by the court):

"Where evidence of a fact which is capable of proof was not produced in the trial of a cause, in which such fact was a material element of the right of the plaintiff to the recovery obtained, because the same was tacitly conceded, and the cause was tried on the theory that if plaintiff established facts warranting a recovery, the amount of the recovery should be the amount prayed, the defendant cannot raise the failure to produce such proof as ground for reversal for the first time in this court."

▮▮▮ The principle followed in *Mann, supra*, applies here. In the proceedings before the Commission, it was tacitly assumed by all of the parties that the figure $601,198,242 represented Oklahoma Natural's total utility operating revenues during the test year. No objection that it was not factually supported was raised before the Commission. The Attorney General who participated in the proceedings before the Commission may not now raise the issue on appeal or for judicial review by this court.

The Attorney General urges that the spread or design of the rate increase as approved by the order of the Commission is grossly discriminatory against the residential ratepayer when compared with its application to other classifications of gas users.

In *Tecumseh Gas Systems, Inc. v. State*,[14] we quoted with approval from *Application of Oklahoma Natural Gas Co.*, Okl., 406 P.2d 273, as follows:

"The rate base method of setting rates, stated in an overly simplified manner, is substantially as follows:

1. Determination of an amount called the "rate base," upon which the Company should be permitted to make a profit. This amount is based upon actual appraisals of the Company properties, and no consideration is given to the number of shares of stock outstanding, or to the value thereof.

2. Determination of a percentage rate of return (6.25% in this case) to apply to the rate base to determine the amount, in dollars, to be allowed to the Company as profit or net income.

3. Determination of the Company's expected expenses in the conduct of the business, including such things as operating expenses, depreciation, taxes, etc.

4. Determination of rate schedules sufficient to repay to the Company its expenses in the conduct of the business, plus an amount, as profit, as determined in (2) above."

In *Arkansas La. Gas Co. v. Sun Oil Co. of Pa.*,[15] we said:

"[N]ot all discrimination between customers is unlawful with the prohibition applying only to those differences in treatment which are unjust or unreasonable. See also *Fretz v. City of Edmond*, 66 Okl. 262, 168 P. 800 (1917).

. . . . .

"There is no precise statutory or court announced basis for determining the justness or reasonableness of class rate level structures or relationships the court generally holding that rate making is the responsibility of a regulatory commission effectively exercising its discretion upon

---

**13.** 208 Okl. 580, 257 P.2d 1074 (1953).

**14.** Supra, n. 10.

**15.** Okl., 554 P.2d 14 (1976).

sufficient evidence before it. Re Lincoln Service Corp., 1 PUR 4th, 511, Wyoming Public Service Commission (1973). It is universally recognized that the fixing of rate schedules for public utilities is a legislative process, and that a public service regulatory body acts in a legislative capacity in approving rate schedules. *Wiley v. Oklahoma Natural Gas Company*, Okl., 429 P.2d 957 (1967). In *Wiley*, supra, we said by the Amendments in 1941 to Article 9 of our Constitution, this Court's power to review legislatively the rate order of the Commission was quite specifically cancelled. * * * our review shall be judicial only, and shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence."

### SPREAD OR DESIGN OF THE RATE INCREASE

Voluminous evidence was presented before the Commission, all of which was undisputed, that of the classes of customers served by Oklahoma Natural, to wit: Residential, Commercial, Wholesale for resale, Regular Industrial and First Interruptible, the rates of return from the residential and commercial customers are substantially less than the rates of return for other classes of customers, to the degree that residential and commercial classes are being subsidized by the regular industrial, first interruptible, and wholesale for resale customers. The evidence further established that the rate of return from residential customers was less than the cost to Oklahoma Natural of furnishing natural gas to them. Based upon such evidence, the Commission found and determined "that steps should be taken to prevent the adoption of any rate structure which would result in any particular class earning a negative rate of return; that as an ultimate goal, rates should be structured in such a way that the rates of return for each customer class at least fall within some determined reasonable range around the system average rate of return; and that in this proceeding the rates should be structured so that meaningful progress can be realized, with an eye on customer impact, toward rates which are more closely aligned with cost of service but also with consideration given to the value of service, customers' ability to pay, customer elasticity and social considerations, since cost of service should not in fact be regarded as the sole factor in determining rates. Another such consideration would be an analysis of which class is responsible for the greatest risk to the system and the increased cost attributable thereto."

Based upon these considerations, the Commission allocated the rate increase to the various customers as follows:

| | Residential | Commercial | Wholesale | Regular Industrial | First Interruptible |
|---|---|---|---|---|---|
| Revenue Inc. | $7,790,201 | $5,706,981 | --- | $6,191,900 | $1,059,261 |
| % Increase | 4.90 | 7.53 | --- | 2.86 | .40 |
| Add'l Franchise Tax on Bills | 3,334,206 | 1,629,520 | --- | 897,103 | ---- |
| Revenue Increase with Franchise | 11,124,407 | 7,336,501 | --- | 7,089,003 | 1,059,261 |
| % Revenue Increase | 7.00 | 9.68 | --- | 3.27 | .40 |

■ We find that there was substantial evidence on the basis of which the Commission determined the spread or design or the rate increase.

The order of the Oklahoma Corporation Commission is affirmed.

IRWIN, C. J., BARNES, V. C. J., and HARGRAVE and OPALA, JJ., concur.

HODGES, SIMMS and DOOLIN, JJ., concur in part and dissent in part.

DOOLIN, Justice, concurring in part; dissenting in part:

I concur in the opinion of the majority as to the prospective application of requiring a party to proceedings before the Corporation Commission, before appeal to this Court is entertained, (1) to make a request by affirmative evidence, (2) objection or (3) proper request for review.

I dissent to that portion of the majority opinion that approves rate increase as ordered and once ordered to its spread, design or application.

HODGES, Justice, concurring in part, dissenting in part.

I dissent to that part of the majority opinion which is numbered (1), (3), (4), (5), and (6). In my opinion those items of cost should not be allowed as a proper expense.

I concur with the other portions of the majority opinion.

I am authorized to state that Justice Robert D. Simms concurs in the views herein expressed.